MICHAEL SEW HOY (Cal Bar No. 243391)
Email:  sewhoym@sec.gov
AMY J. LONGO (Cal. Bar No. 198304)
Email:  longoa@sec.gov
TAMAR M. BRAZ (Cal. Bar No. 264080)
Email:  brazt@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Michele Wein Layne, Regional Director
Alka N. Patel, Associate Regional Director
Amy J. Longo, Regional Trial Counsel
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>vs.<br><br>SILICONSAGE BUILDERS, LLC aka SILICON SAGE BUILDERS and SANJEEV ACHARYA,<br><br>Defendants. | Case No. 3:20-cv-09247<br><br>**COMPLAINT** |

Plaintiff Securities and Exchange Commission ("the Commission" or "the SEC") alleges:

**SUMMARY OF THE ACTION**

1.      This matter concerns a $119 million securities offering fraud perpetrated primarily against members of the South Asian community in Northern California by defendant Sanjeev Acharya and his real estate development company, defendant SiliconSage Builders, LLC aka Silicon Sage Builders ("Silicon Sage Builders" or "SSB") (collectively the "Defendants").

2.      Acharya and Silicon Sage Builders develop real estate projects in the Bay Area.  The Defendants financed the projects in part by selling retail investors promissory notes and membership interests in entities that loaned money to the projects.  Acharya marketed these investments to South Asian friends and family and then sought referrals, expanding his investor base to over three hundred investors in the Northern California South Asian community.

3.      Since at least August 24, 2016, Silicon Sage Builders and all but one of its real estate development projects have not been profitable, because the property sales generated by its business have not generated enough cash to either return investor capital, pay returns to investors, or provide any income to Silicon Sage Builders.  Nevertheless, since August 24, 2016, SSB has raised approximately $119,246,755 from approximately 250 investors through a continuous series of misrepresentations and omissions and other deceptive conduct:

   a.   Acharya falsely described Silicon Sage Builders and all of its real estate projects as efficient, successful, and profitable when, in fact, from 2016 to 2019, all but one of his projects had significant cost overruns and did not generate enough revenue to cover the overruns, leaving SSB with mounting, undisclosed liabilities to investors, totaling over $18 million by 2019;

   b.   Acharya falsely described the interest payments paid to certain investors as derived from SSB's profits across all projects when, in fact, SSB used new investor funds to make these payments;

   c.   Acharya falsely told investors that they could redeem their capital in one of the funds after one year when, in fact, since 2018, Acharya has repeatedly declined capital redemption requests from certain investors because he did not have funds sufficient to

1    meet the redemption requests; and

2        d.   The offering materials for one of the funds falsely described the size of one of the

3        offerings, whose returns were to be derived from SSB's aggregated profits, as between $7

4        million and $11 million, when, in fact, at one point, Acharya raised over $50 million in

5        the offering. The actual size of the offering also far exceeded the limits set forth in the

6        offering materials, which stated that "the total capital contributions raised by [the Fund] at

7        any given point of time shall not exceed 50% of the reserves and projected profits, over a

8        2 year window, of Silicon Sage Builders."

9        4.    By their actions, Defendants violated the antifraud requirements of the federal

10   securities laws.  Specifically: Defendants violated Sections 17(a)(1)-(a)(3) of the Securities Act of

11   1933 ("Securities Act") [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)] and Section 10(b) of the Securities

12   Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d), 78u(e), and 78aa] and Rules 10b-

13   5(a)-(c) thereunder.

14       5.    The SEC requests, among other things, that the Court: (i) preliminarily enjoin

15   Defendants from further violating the federal securities laws as alleged in this complaint; (ii) order an

16   accounting, asset freeze, and preservation of documents as to each of the Defendants and appoint a

17   permanent receiver over Silicon Sage Builders and its subsidiaries and affiliates; (iii) permanently

18   enjoin Defendants from further violating the federal securities laws as alleged in this complaint; (iv)

19   order Defendants to pay disgorgement with prejudgment interest; and (v) order Defendants to pay

20   civil monetary penalties based upon these violations.

21                              **JURIDISTION AND VENUE**

22       6.    The Commission brings this action pursuant to Sections 20(b), 20(d), and 22(a) of the

23   Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)] and Sections 21(d), 21(e), and 27 of the

24   Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

25       7.    This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1), and

26   22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d)(1), and 77v(a)] and Sections 21(d), 21(e), and

27   27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

28       8.    Venue is proper in this District pursuant to Section 22(a) of the Securities Act [15

1  U.S.C. § 77v(a)] and Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)]. Acts, practices,

2  transactions, and courses of business that form the basis for the violations alleged in this Complaint

3  occurred within this district.  In addition, venue is proper in this district because Defendant Acharya

4  resides in this district and Defendant Silicon Sage Builders has its principal place of business in this

5  district.

6      9.    Under Civil Local Rule 3-2(d), this case should be assigned to the San Jose Division

7  because a substantial part of the events or omissions that give rise to the claims alleged herein

8  occurred in Santa Clara County.

9                              **DEFENDANTS**

10     10.    Silicon Sage Builders is a California limited liability company formed by Sanjeev

11 Acharya in 2011 with its principal place of business in Sunnyvale, California.  SSB is one of many

12 affiliated companies owned and controlled by Sanjeev Acharya that, together, develop real estate

13 projects in the Bay Area under the name "Silicon Sage."  SSB is not registered with the Commission

14 in any capacity and it has not registered any offering of its securities.

15     11.    Sanjeev Acharya resides in Sunnyvale, California.  Acharya founded Silicon Sage and

16 is the CEO, owner, and manager of all of the Silicon Sage entities.  Acharya does not hold any

17 securities licenses and is not registered with the Commission in any capacity.

18                            **RELATED PARTIES**

19     12.    SiliconSage Bridge Fund, LLC (the "Bridge Fund" or "SSBF") is a California limited

20 liability company formed in 2014 with its principal place of business in Sunnyvale, California.  The

21 Bridge Fund purportedly loans money to Silicon Sage–affiliated companies for the purpose of their

22 development of real estate properties. The Bridge Fund has not registered with the Commission in

23 any capacity and it has not registered any offering of its securities.  Acharya is the manager of the

24 Bridge Fund.

25     13.    SiliconSage Construction, Inc. ("SSC") is a California company formed in 2011 with a

26 principal place of business in Sunnyvale, California.  SSC is one of several affiliated companies

27 owned and controlled by Acharya that develop real estate projects in the Bay Area and is part of

28 "Silicon Sage"  (together with SSB, and the following defined below: SS Homes, SS Inc. and the

Builder LLCs referred to as "Silicon Sage").  SSC acts as Silicon Sage's in-house contractor.  SSC is not registered with the Commission in any capacity and it has not registered any offering of its securities.

14.     SiliconSage Homes, Inc. ("SS Homes") is one of several affiliated companies owned and controlled by Acharya that develops real estate projects in the Bay Area.  SS Homes markets the properties.

15.     SiliconSage, Inc. ("SS Inc.") is one of several affiliated companies owned and controlled by Acharya that develops real estate projects in the Bay Area.  SS Inc. provides technical support.

16.     Each Silicon Sage "Builder LLC" is a limited liability company that owns and develops a specific Silicon Sage project, and is owned by SSB and Acharya.

18.     Acharya used many affiliated entities he founded for Silicon Sage to solicit investments, including: (1) the Silicon Valley Investment Partnership LLC ("SVIP"), (2) SiliconSage Investments 3 LLC ("SSI 3"); (3) SiliconSage Investments 4 LLC ("SSI 4"); (4) the SiliconSage Fund 1, LLC, Series 1, 2 and 3 ("SSF1 - 1, 2, & 3"); (5) the Little Portugal OZ Fund LP; and (6) Alum Rock Holdings, LLC ("Alum Rock").

## FACTUAL ALLEGATIONS

### A.  Silicon Sage's Business

19.     Silicon Sage develops large, multi-unit, multi-use real estate projects in key cities in the Bay Area and manages the projects from beginning to end:  it buys the land, obtains the permits, designs the buildings, acts as general contractor for the projects, and sells the resulting properties.

20.     Silicon Sage is comprised of numerous affiliated companies, all owned and operated by Acharya and acting as one enterprise.

21.     Silicon Sage Builders buys the lands and owns the projects through the project-specific Builder LLCs that are wholly owned by SSB and Acharya.

22.     SSC acts as the general contractor and builds the projects.

23.     SSH and SS Inc. market the resulting properties and provide technology support respectively.

i)      **Silicon Sage's Projects**

24.     Silicon Sage's projects have changed over time, from smaller "Slab on Grade" projects, to "Smaller Podium" projects, to the current "Larger Podium" projects. A list of Silicon Sage's projects is attached as Exhibit A.

25.     ***Slab on Grade Projects.***  According to Acharya, in or around 2011, SSB began building four "slab on grade" projects, which are single family homes and town homes with a concrete foundation, with between two and eight units.  These projects were completed between 2012 and 2014.

26.     ***Smaller Podium Projects.***  In 2012 and 2013, SSB turned to developing "smaller podium" projects, which are larger, multi-use properties, with between 13 and 60 condos, often with space for office or retail.  These projects were more complex because they required one or two stories of concrete, with wood construction on top. These projects included the Mathilda 1, Crown Court, Alexis, Saratoga, Monroe, and Franklin projects, all of which took between four and seven years to complete and according to SSB were completed between 2015 and 2019.

27.     ***Larger Podium Projects.***  From 2013 to the present, SSB launched "larger podium" projects, *i.e.* podium projects with closer to 100 units or more.  These projects include the Balbach, Osgood 1, Almaden, Peralta, Osgood 2, Mathilda 2, Little Portugal, and Alum Rock projects. According to SSB, these projects are in various stages of development, with Acharya claiming that three of the projects – Balbach, Osgood 1, and Almaden– will exit by March 2021.

ii)     **The Financing for Silicon Sage's Projects**

28.     Acharya and Silicon Sage financed their real estate projects with bank and construction loans, followed by several offerings to retail investors.

29.     Acharya originally marketed his investments to South Asian friends and family and then sought referrals, expanding his investor base to hundreds of investors primarily located in the Northern California South Asian community.

30.     Acharya routinely described the returns to his investors as deriving from the profits generated by Silicon Sage Builders' properties.

31.     Specifically, Acharya represented that at the time of a property's exit, the proceeds of

the sale are first used to pay off the bank and construction loans and then to pay off the investors' capital and interest; only after the investors are paid does Silicon Sage itself receive any profits.

32.     Retail investors could invest in Silicon Sage projects in three general ways: equity interests, the Bridge Fund, and promissory notes.

33.     ***Equity offerings***.  Since the inception of Silicon Sage in or around 2011, equity investors have invested funds toward specific projects.

34.     The overall structure for each of these investments was generally the same:  investors purchased membership interests in an LLC, which loaned money to the Builder LLC that owned the project (or to an entity that loaned money to the Builder LLC), for purposes of purchasing the land and developing the project.  Investors who rolled over their interests into new equity investments sometimes purchased an interest in a particular class of SVIP, which in turn purchased the membership interest in the LLC.

35.     Once the project was complete and the properties were all sold, the revenues were to be used first to pay the bank or construction loan and then to return capital and interest to the equity investors.

36.     Investors were offered high rates of return, ranging from 18% to 23% per annum, to be paid once the project was completed from the proceeds of the sale.  Any residual profits would go to SSB.

37.     Altogether, as of October 27, 2020, Defendants have received approximately $97,547,296 from equity investors, with at least $63,442,436 raised since August 24, 2016.

38.     Equity projects for which Acharya solicited and raised investor monies between 2012 and the present include:  SVIP Class W; SVIP, Class A (Connemara and Fair Oaks); SVIP, Class B (Evandale and Mathilda 1); SVIP, Class C (770 15th Street and Madison Place (aka Monroe)), Silicon Sage Investments ("SSI 1") (Crown Court, Alexis, Saratoga, Franklin); Silicon Sage Investments 2 ("SSI 2") (Series E-1) (Almaden); Silicon Sage Investments 3 ("SSI 3") (Series E-2)  (Balbach); Silicon Sage Investments 4 ("SSI 4") (Series E-3) (Osgood 1); Silicon Sage Fund 1 ("SSF1")– Series 1 (Mathilda 2); SSF1 – Series 2 ((Peralta), SSFI – Series 3 (Osgood 2); Little Portugal OZ Fund LP (Little Portugal), Alum Rock Holdings LLC (Alum Rock); and Centerville Station.

39.     **Bridge Fund**.  In 2014, Acharya formed the Bridge Fund.  Investors in the Bridge Fund purchased membership interests in the Bridge Fund pursuant to subscription and operating agreements.

40.     Unlike the equity investors, the Bridge Fund investors' money was to be used across all of the projects in Silicon Sage's portfolio, on an as-needed basis to complete construction.

41.     According to the offering documents, the Bridge Fund projected returns of 15% per annum, paid monthly, derived from SSB's aggregated profits, across the projects.

42.     According to the offering documents, investments in the Bridge Fund were locked up for one year, after which investors could give notice and request return of their principal, which would be processed after an additional 90 days.

43.     According to the offering documents, SSB guaranteed repayment of the Fund's loans.

44.     The Bridge Fund offering documents stated that "the total capital contributions raised by [the Bridge Fund] at any given point of time shall not exceed 50% of the reserves and projected profits, over a 2 year window, of [Silicon Sage]."

45.     According to the subscription agreement, the Bridge Fund offering was between $7 and $11 million (35-55 units at $200,000 per unit).

46.     According to Acharya, from 2014 to October 2020, the Bridge Fund has raised $67,173,728, of which at least $31,094,428 was raised from investors since August 24, 2016.  Since 2014, approximately $26,614,391 was withdrawn as either capital redemptions or rolled over to another Silicon Sage investment product and approximately $21,318,453.70 was paid in monthly interest.

47.     As of October 2020, the Bridge Fund has $19.58 in its bank account, and owes the Bridge Fund investors approximately $40 million.

48.     **Promissory notes**.  Beginning in October 2017, Defendants began offering promissory notes as an additional form of investment in Silicon Sage.

49.     The duration and size of the notes varied from 1-24 months and between $10,000 to over $1 million.

50.     Generally, the Builder LLC promised to pay the note back, with a range of interest

rates, and the Builder LLC – and in some cases SSB and Acharya – guaranteed repayment.

51.     Since 2017, the Defendants raised approximately $24,709,891.23 from approximately 97 notes issued to at least 63 investors in California, Nevada, Georgia, and Texas.

52.     For all three forms of investment, Acharya personally solicits investors.  And until early 2020, Acharya hosted in-person quarterly investment meetings at which he regularly described Silicon Sage's profitable performance.

53.     Acharya also signs the subscription and operating agreements for Silicon Sage's various offerings.

**B.  Silicon Sage's Investments are Securities**

54.     Each of the forms of Silicon Sage investments are securities under the federal securities laws.

55.     Each form of investment was a security in the form of an investment contract.

56.     For each form of investment, Defendants solicited investors to provide funding for Silicon Sage's real estate projects.

57.     For each form of investment, Silicon Sage would only make a profit if it had excess profits available after paying returns to all investors.

58.     For each form of investment, investors' fortunes were tied to Silicon Sage's and investors were entirely reliant on Defendants' efforts to earn returns.

59.     The Silicon Sage promissory notes are also a security in the form of a note.

60.     The promissory notes were an investment in a business enterprise.

61.     The promissory notes were issued to raise money to complete real estate projects, at high rates of return.

62.     Defendants sold approximately 97 notes to at least 63 investors in California, Nevada, Texas, New York, Georgia.

**C.  Silicon Sage Has Not Been Profitable Since August 2016 and Has Had Significant Financial Difficulties**

63.     Since on or around August 2016, SSB has exited all but one of its real estate projects without realizing sufficient profits to cover cost overages and pay back the investors.

64.     From August 24, 2016 to October 6, 2020, over $26 million in liabilities were owed to the Bridge Fund for exited and abandoned projects.

65.     Defendants found that podium builds required different expertise and began incurring significant construction cost overruns.

66.     For example, the Mathilda, Monroe, Crown Court, Saratoga, and Franklin projects were over budget.

67.     Pursuant to contracts between the Builder LLCs and the issuers of the bank and construction loans, these overruns were to be borne by SSC, not the Builder LLC.

68.     According to Acharya, SSB had to cover SSC's losses out of the profits it received from the exit of the properties.

69.     According to Acharya, SSB did not generate enough revenues from the exit of the properties to cover these overages.

70.     For example, the Crown Court, Saratoga, Monroe, and Franklin projects were unable to return the funds loaned to them by the Bridge Fund.

71.     The Monroe and Franklin projects were unable to return the funds owed to promissory note holders.

72.     The Monroe project was unable to repay the funds it owed to SVIP, Class W.

73.     Because SSB's interests were subordinated to all of its investors, it also made no profits from these projects, including the Crown Court, Saratoga, Monroe, and Franklin projects.

74.     Defendants also used Bridge Fund money for five projects totaling approximately $4,486,000 that they later abandoned and thus could never create any profits for investors or SSB.

**D.   For Several Years, SSB and SSC Have Carried Liabilities to Investors**

75.     As a result of the construction cost overruns, the inability to make sufficient profits on the completed projects, and use of investor money for projects that were later abandoned, SSB has owed liabilities to investors that have only increased.

76.     ***Bridge Fund***:  As of August 24, 2016, SSB's liabilities owed to the Bridge Fund reached at least $4,147,062, and, by July 3, 2019, it owed approximately $18,004,660 to the Bridge Fund, in addition to the interest incurred on the loans to the various affiliates, which, by October 6,

2020, totaled $6,686.750.

77. **Class W**: Since at least March 7, 2018, SSB has owed $1,663,367 to the Class W investors.

78. **Promissory notes**: As of October 26, 2020, SSB and the various Builder LLCs carry liabilities of approximately $24,709,891 to the promissory noteholders.

**E. Defendants Conceal Silicon Sage's Financial Difficulties**

79. In order to conceal the unprofitability of the projects and to continue raising money, and contrary to its stated purpose, Defendants used the Bridge Fund to pay the monthly interest payments to Bridge Fund investors with funds raised from other investors.

80. At a time when neither SSB nor the Bridge Fund were profitable, Defendants solicited existing investors to rollover their Silicon Sage investments.

81. When an investor agreed to a rollover, Defendants could keep the funds invested in the business, rather than paying it out to investors.

82. For example, on July 27, 2018, an investor acquired a promissory note in Osgood 1. When the note and interest came due a year later, Acharya convinced the investor to renew the investment, including the interest earned, on the same terms beginning July 27, 2019.

83. By March 2020, the investor needed the funds to purchase a different, non-Silicon Sage property, and on March 24, 2020, he gave Acharya notice that that he wished to redeem his investment in Osgood 1.

84. When the investor did not receive his funds, he reached out to Acharya again. Acharya first offered the investor an apartment in the Downtown Gateway/Franklin project, which the investor refused.

85. On July 19, 2020, Acharya told the investor that if he swapped his interest in Osgood 1 for one in Osgood 2, Acharya could pay the investor back because he had funds coming in for Osgood 2 that could be utilized.

86. Achieving rollovers from investors out of the Bridge Fund enabled the Defendants to avoid having to honor guaranteed redemption requests.

87. For example, when the same investor who acquired the interest in Osgood 1 refused to

1 rollover in July 2020 and reiterated his requests for payment, Acharya did not respond to his repeated

2 requests.

3       88.     Another investor who invested in the Bridge Fund on August 28, 2015 requested her

4 payment in the fourth quarter of 2019 and again on March 27, 2020, but Acharya did not honor these

5 requests and the investor never received her funds.

6       89.     Citing "short term liquidity" issues, between 2018 and 2020, Defendants denied

7 several demands for return of Bridge Fund investors' principal.

8       **F.  Defendants Defrauded Investors by Making Material Misrepresentations**

9       90.     Acharya made several representations to prospective Silicon Sage investors, in the

10 subscription and operating agreements and orally.

11              **1.      Defendants Misrepresented the Profitability of the Investments**

12      91.     Since 2016, Acharya always described Silicon Sage as profitable and successful.

13      92.     He told investors that because Silicon Sage was vertically integrated, he was able to

14 build the properties with significant savings.

15      93.     He said that Silicon Sage had "successfully designed built and exited multiple

16 projects" and that its teams had a "proven track record" with "sophisticated techniques for design and

17 execution."

18      94.     He described all of his projects, including the Crown Court, Saratoga, Franklin, and

19 Monroe projects, as profitable for Silicon Sage and its investors.

20      95.     He asserted that all his investors have been paid their returns, and that those returns

21 were derived from the profits generated by SSB's properties.

22      96.     And as of at least 2019 and through at least July 2020, Acharya was soliciting

23 investors with the representation that Silicon Sage had exited 11 projects successfully.

24      97.     From August 24, 2016 on, the statements regarding the profitability of Silicon Sage

25 and all of its projects were misleading because, as described above, since August 24, 2016, Silicon

26 Sage has exited all but one of the smaller podium estate projects – Alexis – without realizing any

27 profits.

28      98.     Acharya did not tell investors that SSB would have to cover SSC's losses or that he

1  was incurring significant cost overruns that were being covered with the Bridge Fund, notes, and

2  SVIP, Class W.

3      99.    Nor did he tell any investors that the few arguably profitable projects Silicon Sage did

4  have – according to Acharya, four slab on grade projects (Connemara, Fair Oaks, Menlo Park,

5  Evandale), Alexis, Mathilda 1, and Washington – had not generated enough profits to cover the

6  overages, pay back the Bridge Fund, Class W, or notes, or generate income for SSB.

7      100.    He also did not disclose the efficiency problems associated with the larger podium

8  projects.

9      101.    Additionally, Acharya did not tell investors that, together with SSC, he owed

10  mounting liabilities to the Bridge Fund, Class W, and the promissory note holders.

11      102.    It would have been an important to a reasonable investor to know that Silicon Sage

12  Builders was unprofitable because, among other things, it affected the safety and security of

13  investors' funds, how the funds were used, and the promised returns.

### 2.    Defendants Misrepresented the Bridge Fund's Use of Funds

15      103.    Since at least 2016, the Bridge Fund Subscription Agreement, signed by Acharya,

16  stated that the Bridge Fund returns would be "derived from aggregated profits earned by [SSB] and

17  various other limited liability companies affiliated with SSB."

18      104.    The Bridge Fund Operating Agreement stated that the "purpose of the [Bridge Fund]

19  is to lend funds to Silicon Sage Affiliated Entities for the purpose of their development of residential

20  and/or mixed use projects on real properties owned by those companies and to hold such priority in

21  right of repayment as stated in promissory notes executed by those other companies, and to engage in

22  any and all other activities as may be necessary or advisable in connection with the foregoing," and

23  that the Bridge Fund would "engage in no other type of business and it shall have no other purpose."

24      105.    These statements were all false because funds raised from Bridge Fund investors were

25  used to pay other Bridge Fund investors' interest.

26      106.    It would have been an important to a reasonable investor to know that the Bridge Fund

27  was paying returns with new investor funds because, among other things, it affected the safety and

28  security of investors' funds, how the funds were used, and the promised returns.

**3.     Defendants Misrepresented the Investors' Ability To Redeem Their Bridge Fund Interests**

107.    Acharya told Bridge Fund investors that they could redeem their capital after one year, after which investors could give notice and request return of principal, which would be processed after an additional 90 days.

108.    But, beginning in 2018 and throughout 2020, Acharya declined redemption requests from some investors, and therefore knew, from 2018 on, at the time he was making these redemption statements to new investors that they were misleading.

109.    It would have been an important to a reasonable investor to know that the Bridge Fund had refused investors' redemption requests because, among other things, it affected the safety and security of investors' funds, how the funds were used, and the promised returns.

**4.     Defendants Misrepresented the Size of the Bridge Fund Offering**

110.    From at least 2016 through the present, the offering materials stated that the Bridge Fund offering was for between $7 million and $11 million.

111.    The offering materials also provided that "the total capital contributions raised by [the Bridge Fund] at any given point of time shall not exceed 50% of the reserves and projected profits, over a 2 year window, of Silicon Sage Builders."

112.    At times, however, the size of the offering greatly exceeded the offering materials and subscription agreement limitations, increasing to over $50 million at the end of 2019.

113.    It would have been an important to a reasonable investor to know that the Bridge Fund had raised far more than represented because, among other things, it affected the safety and security of investors' funds, how the funds were used, and the promised returns.

**G.   Defendants Engaged – and are Engaging – in Deceptive Conduct**

114.    Rather than reveal the true financial state of Silicon Sage to investors, since at least March 2020, Acharya engaged – and is engaging – in conduct designed to enable him to continue raising money and to discourage existing investors to withdraw their funds or to swap their interests for different Silicon Sage investments.

1.     **Defendants Blame the Pandemic Instead of Disclosing The Financial Problems**

115.     Beginning in or around March 2020, Acharya began warning of a short-term "liquidity" problem purportedly stemming from the COVID-19 pandemic, urging new investments.

116.     On March 18, 2020, Acharya emailed the investors that: "there is a short term impact on inflow of new investors' monies because of stock market crash.  We are encouraging investors who have liquid cash to invest in short or long term basis in the company" and "looking for every investor who can help with new investments."  Without mentioning any pre-COVID problems, he concluded that, "in the big scheme of things our current sales are in good shape… we have a bright future and great things happening in terms of building the company."

117.     In that same month, he told an investor that, despite the COVID-19 pandemic, the business was "all good," and that Acharya was still paying interest on the Bridge Fund, but had a short term cash need.

118.     The same month, however, Acharya asked certain Bridge Fund investors to defer their interest payments for up to six months in exchange for an increase in the interest they would supposedly receive at the end of the period.

119.     In none of these communications did Acharya disclose the existing cost overruns and unprofitable or abandoned projects, nor the use of Bridge Fund monies to pay investor interest, or refusal to honor Bridge Fund redemptions.

120.     In or around May 26, 2020, Acharya informed the Bridge Fund investors by email that he could not make interest payments or honor redemption requests for three months, attributing this solely to cash flow issues from the pandemic.

121.     Acharya disclosed none of the existing pre-COVID financial problems in this email.

122.     Starting in June 2020, Acharya began hosting video investor calls.

123.     In a June 9, 2020 investor presentation, Acharya told investors that, with regard to the "COVID-19 General Business Impact," "[th]e biggest impact is that the investments from investors dried up since March 2020.  Not because of any SiliconSage concerns."

124.     Acharya continued to solicit new equity and note investors in June and July 2020.

125.    For example, he solicited approximately $250,000 from one new equity investor in June and July 2020, continuing to represent that he had 11 profitably-exited projects, specifically identifying the Crown Court, Monroe, Saratoga, and Franklin projects, among others, and had paid his investors their returns out of Silicon Sage's profits.

126.    Acharya took in over $17 million between March 18, 2020 and October 27, 2020, across all Silicon Sage's projects, including new monies and funds rolled over or exchanged from investors' other Silicon Sage investments—including over $1 million for the Bridge Fund.

127.    Acharya took in approximately 30 new Silicon Sage investors since March 2020.

**2.      Defendants Shift the Blame for the Financial Problems from the Pandemic to Past Mistakes**

128.    Beginning in late June 2020, Acharya began attributing Silicon Sage's financial difficulties to causes other than the pandemic.

129.    At a June 23, 2020 investor meeting, Acharya acknowledged that Bridge Fund interest payments were impacted by the lack of new investor money, stating that "the biggest challenge in reopening Bridge Fund is figuring out consistent cash flow for Bridge Fund interest payments in a sustainable manner."

130.    At that same meeting, Acharya offered Bridge Fund investors the option of rolling their investment over to Alum Rock or to Osgood 2 as a down payment for a future condo—an option some investors elected.

131.    In July 2020, a few investors volunteered to liaise with Acharya and met with him several times.

132.    During these meetings, Acharya admitted to this investor group that:

    a.   all of his past projects except one had not been profitable—and that he had not made any money;

    b.   the Bridge Fund had in fact already raised $45 million – not $7 or 11 million as advertised;

    c.   Silicon Sage had no cash and that all the funds raised from investors had been spent; and

d.  he had no investor money left despite having raised $20 million for Alum Rock, even though the project had not yet purchased all of the real estate.

133.    After one of the investor volunteers ("Investor 1") conveyed this information to a broader group of investors, Acharya tried to suppress the information from circulating to the broader investor group.

134.    For example, on July 28, 2020, Acharya emailed the investors saying that the information conveyed by Investor 1 was the view of just that investor, not the investor volunteers as a whole.  Acharya said that he had "deliver[ed] many initial projects on time and at or near budget," that he had "made some execution delay mistakes resulting in cost overruns as I scaled up Silicon Sage to much larger projects...." and that there was "no [] swindling involved."

135.    Acharya then called Investor 1 and offered him cash for his Bridge Fund investment if he left "quietly."

136.     When Investor 1 declined, Acharya offered to give the same deal to the Investor 1's friends, saying he had many investors who trusted him and that he could get the money.

137.    When Investor 1 declined again, Acharya offered him a condo.

138.    On or about July 19, 2020, Acharya invited another investor to swap his existing interest for an equivalent interest in another property, claiming that he was "getting new investors" and had "millions of dollars coming in."  When the investor said this would be tantamount to a Ponzi scheme, Acharya replied that as the manager, he could do whatever he wanted.

139.    Beginning in August 2020, Acharya began to attribute Silicon Sage's financial difficulties to past "mistakes."

140.    In an August 4, 2020 investor call, he identified "cost control issues which I am responsible for and that a "constant criticism of [his] operations was that [he] ha[d] not been forthcoming on project finances and project issues," and stated that he was "making changes to this."

141.    On an August 14, 2020 investor call, when asked why he had not been more transparent with investors, he said that he agreed that transparency would have helped, saying, "I should have done it.  Back then, maybe my thinking was that everybody's returns will come... So ... I really didn't bother to get into details, but what I was not thinking, what my mistake was that I wasn't

thinking a downside scenario."

142.   In the accompanying presentation to the August 14, 2020 call, Acharya stated he could have "spent more time doing post mortem on early projects to learn from them and not repeat the same mistakes."

143.   In presentations on August 4 and August 20, 2020, Acharya continued to solicit swaps between the various investments—Bridge Fund investors could convert their investment into an equity investment in Alum Rock or a down payment for a condo in Osgood 2.  He also offered all investors the opportunity to exchange their investments for a condo in Osgood 1 or a condo in Osgood 2, if they supplemented their existing investment with new cash.

144.   In the August 20, 2020 investor presentation, Acharya described an "urgent need" for "immediate working capital," claiming there would be "no dilution or any effect to" the equity investors' returns.

**3.     Defendants Acknowledge Their Financial Problems**

145.   On August 21, 2020 and September 9, 2020, however, in recorded investor calls, Acharya finally admitted to Silicon Sage's construction overruns, lack of profitability, the liabilities owed to the Bridge Fund, Class W, and notes, and the use of Bridge Fund money to pay Bridge Fund interest.

146.   Over the course of the two investor presentations on August 21, 2020 and September 9, 2020 and in his written presentation materials, Acharya  revealed that the Mathilda, Monroe, Crown Court, Saratoga, and Franklin projects had been over budget; that the Monroe project did not pay the Bridge Fund, notes investors, or equity Class W investors; that the Franklin project did not pay the Bridge Fund or notes investors, and that neither the Crown Court project nor the Saratoga project paid the Bridge Fund investors.  He claimed to have "learnt this lesson quite late when we were committed to finishing" the projects.

147.   He revealed that the Balbach, Alamaden, and Osgood 1 projects were all over budget.

148.   He described the Bridge Fund as a "mistake," because "for a development business that [has] exits that take four to five years out… till the exit happens, there is no income coming." He admitted to a "lack of controls and visibility till after the damage was done," nevertheless still

claiming that "future projects will have a huge benefit." As for the Bridge Fund, he cited the "lack of leeway in interest terms and redemption of Bridge Fund is not suitable for our type of business," saying he would close it and "work on redemption."

### 4. Defendants Continue to Defraud Investors And Engage in Deceptive Conduct by Making Material Misrepresentations

149.    Acharya continues to actively seek new investors.

150.    He has raised approximately $17,394,341 from on or about March 18, 2020 to on or about October 27, 2020, including new investments, swaps and rollovers.

151.    He has raised this amount from at least 50 investors, approximately 30 of which are new.

152.    Acharya continues to urge existing investors to deposit new funds—and to refer other new investors—emphasizing his need for additional cash to complete the projects because he lacks any liquidity, and offering a variety of investment options, including investments in future projects and conversions of existing interests in projects to interests in future projects.

153.    For example, in a presentation to investors on September 25, 2020, Acharya stated "[e]quity investors are funding the gap money needed to keep … [a] project going," that "Bridge Fund Investors are welcome to join the effort," and that the "[g]ap fund will be Senior Note to Equity and will have attractive returns."

154.    In an October 16, 2020 presentation to investors, he stated that he "need[ed] to raise $1m for" a project to get to a conclusion and that "[t]here is an immediate need for liquidity" for that project.

155.    Despite his promises of transparency, Acharya continues to provide inconsistent and contradictory financial information to new and existing investors.

156.    As recently as October 5, 2020, Acharya has orally discouraged at least one investor from bringing their concerns to the SEC.

### H. Defendants Knew, Or were Reckless in not Knowing, They Were Making Materially Misleading Statements and Engaging in Deceptive Conduct

157.    Defendants knew, or were reckless in not knowing, that their representations regarding

the profitability of Silicon Sage and all of its real estate projects, the source of the interest payments paid to Bridge Fund investors, the ability to redeem Bridge Fund investments, and the amount of the Bridge Fund offering were false at the time he made them.

158.    Defendants knew, or were reckless in not knowing, that they engaged in a scheme to defraud by making these false statements, and by making Ponzi payments, when using new Bridge Fund money to pay existing investors' interest and by downplaying the crisis facing the business while asking investors to contribute new capital, roll over existing investments, and defer interest payments.

159.    Acharya controls Silicon Sage.  He owns and manages all of the Silicon Sage companies, is the CEO of the enterprise, and he does all of the fundraising.

160.    Acharya has admitted his responsibility for the company's cost overruns and to knowing certain projects were unprofitable "in the middle of construction" when he was "committed to finishing them."

161.    Acharya has continued raising money based on these false representations in 2020, even after he knew he was denying redemption requests and deferring owed interest.

162.    Knowing that his projects had been unprofitable for many years running, Acharya lulled investors not to withdraw their funds and to defer their owed interest blaming the COVID pandemic, and not his "past mistakes".

163.    Acharya has admitted his lack of transparency and reliable recordkeeping and controls, making it difficult to determine whether Silicon Sage is profitable.

164.    When recently pressed by investors about his misleading statements during a recorded investor video call in September 2020, Acharya did not deny that the statements were false; rather, he claimed that, at the time, he had hoped that he would, at some point, make enough money to cover his losses.

165.    Acharya's recent offers to select investors to buy them out with other investor funds because he "can do whatever he wants" further show a high degree of scienter.

166.    Because Acharya is Silicon Sage's manager, founder and owner, and because he solicited all of the investors' monies on behalf of the enterprise, his scienter, conduct, and statements

may be imputed to Silicon Sage.

167.    Defendants were also negligent in that they did not exercise reasonable care: Defendants misrepresented material facts to investors and potential investors, and engaged in deceptive conduct concerning the safety and security of investors' funds, how the funds were used, and the promised returns.

**FIRST CLAIM FOR RELIEF**

**Fraud in the Connection with the Purchase and Sale of Securities**

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b)**

**(against all Defendants)**

168.    The SEC realleges and incorporates by reference paragraphs 1 through 167 above.

169.    As set forth above, Defendants made several material misrepresentations, and omitted material information, to Silicon Sage investors, concerning the safety and security of investors' funds, how the funds were used, and the promised returns, including:  the profitability of Silicon Sage and all of its real estate projects, the source of the interest payments paid to Bridge Fund investors, the ability to redeem Bridge Fund investments, and the amount of the Bridge Fund offering.

170.    As Silicon Sage's sole principal and the person who solicited all of the investors' monies on behalf of the enterprise, Acharya is a maker of these statements to investors, along with the company.

171.    By engaging in the conduct described above, Defendants, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

172.    Defendants, with scienter, made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading by the conduct described in detail above.

173.    By engaging in the conduct described above, Defendants violated, and unless

1  restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C.

2  § 78j(b), and Rule 10b-5(b) thereunder, 17 C.F.R. § 240.10b-5(b).

3  **SECOND CLAIM FOR RELIEF**

4  **Fraud in Connection with the Purchase or Sale of Securities**

5  **Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c)**

6  **(against all Defendants)**

7  174.  The SEC realleges and incorporates by reference paragraphs 1 through 167 above.

8  175.  Defendants misled and deceived Silicon Sage  investors (a) about the safety and

9  security of investors' funds, how the funds were used, and the promised returns, including:   the

10  profitability of Silicon Sage and all of its real estate projects, the source of the interest payments paid

11  to Bridge Fund investors, the ability to redeem Bridge Fund investments, and the amount of the

12  Bridge Fund offering, and (b) by making Ponzi payments and lulling existing investors to contribute

13  new capital, roll over existing investments, and defer interest payments.

14  176.  By engaging in the conduct above, Defendants, directly or indirectly, in connection

15  with the purchase or sale of a security, and by the use of means or instrumentalities of interstate

16  commerce, of the mails, or of the facilities of a national securities exchange:  (a) employed devices,

17  schemes, or artifices to defraud; and (b) engaged in acts, practices, or courses of business which

18  operated or would operate as a fraud or deceit upon other persons.

19  177.  Defendants, with scienter, employed devices, schemes and artifices to defraud; and

20  engaged in acts, practices or courses of conduct that operated as a fraud on the investing public by the

21  conduct described in detail above.

22  178.  By engaging in the conduct described above, Defendants violated, and unless

23  restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C.

24  § 78j(b), and Rules 10b-5(a) and 10b-5(c) thereunder, 17 C.F.R. §§ 240.10b-5(a) & 240.10b-5(c).

25  **THIRD CLAIM FOR RELIEF**

26  **Fraud in the Offer or Sale of Securities**

27  **Violations of Section 17(a)(1) and 17(a)(3) of the Securities Act**

28  **(against all Defendants)**

179.    The SEC realleges and incorporates by reference paragraphs 1 through 167 above.

180.    Defendants misled and deceived Silicon Sage investors (a) about the safety and security of investors' funds, how the funds were used, and the promised returns, including:   the profitability of Silicon Sage and all of its real estate projects, the source of the interest payments paid to Bridge Fund investors, the ability to redeem Bridge Fund investments, and the amount of the Bridge Fund offering, and (b) by making Ponzi payments and lulling existing investors to contribute new capital, roll over existing investments, and defer interest payments.

181.    By engaging in the conduct described above, Defendants, and each of them, directly or indirectly, in the offer or sale of securities, and by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails directly or indirectly:  (a) employed devices, schemes, or artifices to defraud; and (b) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

182.    Defendants, with scienter, employed devices, schemes and artifices to defraud; and, with scienter or negligence, engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

183.    By engaging in the conduct described above, Defendants violated, and unless restrained and enjoined will continue to violate, Sections 17(a)(1) and 17(a)(3) of the Securities Act, 15 U.S.C. §§ 77q(a)(1) & 77q(a)(3).

## FOURTH CLAIM FOR RELIEF

### Fraud in the Offer or Sale of Securities

### Violations of Sections 17(a)(2) of the Securities Act

### (against all Defendants)

184.    The SEC realleges and incorporates by reference paragraphs 1 through 167 above.

185.    In the offer or sale of securities, Defendants obtained money by means of material misrepresentations and omissions to Silicon Sage investors concerning the safety and security of investors' funds, how the funds were used, and the promised returns, including:  the profitability of Silicon Sage and all of its real estate projects, the source of the interest payments paid to Bridge Fund investors, the ability to redeem Bridge Fund investments, and the amount of the Bridge Fund

1    offering.  This information was material, and Defendants obtained millions of dollars as a result.

2        186.    By engaging in the conduct described above, Defendants, directly or indirectly, in the

3    offer or sale of securities, and by the use of means or instruments of transportation or communication

4    in interstate commerce or by use of the mails directly or indirectly obtained money or property by

5    means of untrue statements of a material fact or by omitting to state a material fact necessary in order

6    to make the statements made, in light of the circumstances under which they were made, not

7    misleading.

8        187.    Defendants, with scienter or negligence obtained money or property by means of

9    untrue statements of a material fact or by omitting to state a material fact necessary in order to make

10    the statements made, in light of the circumstances under which they were made, not misleading.

11       188.    By engaging in the conduct described above, Defendants violated, and unless

12    restrained and enjoined will continue to violate, Section 17(a)(2) of the Securities Act, 15 U.S.C.

13    § 77q(a)(2).

14                                    **PRAYER FOR RELIEF**

15       WHEREFORE, the Commission respectfully requests that the Court:

16                                              **I.**

17       Issue findings of fact and conclusions of law that Defendants committed the alleged

18    violations.

19                                             **II.**

20       Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure,

21    (1) preliminarily enjoining Defendants; and (2) permanently enjoining Defendants, and their officers,

22    agents, servants, employees and attorneys, and those persons in active concert or participation with

23    any of them, who receive actual notice of the judgment by personal service or otherwise, and each of

24    them, from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], and Section 10(b) of

25    the Exchange Act [15 U.S.C. §§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

26                                            **III.**

27       Issue, in a form consistent with Fed. R. Civ. P. 65, an order freezing the assets of Defendants

28    and their affiliated entities; prohibiting each of the Defendants from destroying documents; ordering

an accounting by both Defendants; and appointing a receiver over Defendant Silicon Sage Builders and its affiliated entities.

### IV.

Order Defendants to disgorge their ill-gotten gains according to proof, plus prejudgment interest thereon.

### V.

Order Defendants to pay civil penalties under Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and/or Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

### VI.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

### VII.

Grant such other and further relief as this Court may determine to be just and necessary.

Dated: December 21, 2020          Respectfully submitted,


/s/ *Amy J. Longo*
Michael Sew Hoy
Amy J. Longo
Tamar M. Braz
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION

# EXHIBIT A

## SILICON SAGE BUILDERS' PROJECTS

| PROJECT TYPE | PROJECT | BUILDER LLC | INVESTMENT ENTITY | STATUS |
|---|---|---|---|---|
| SLAB ON GRADE | Connemara | * | SVIP, Class A | Exited 2012 |
| | Fair Oaks | 411 Fair Oaks Drive, LLC | SVIP, Class A | Exited 2013 |
| | 770 15th St | * | SVIP, Class C | Exited 2013 |
| | Evandale Row | 115 Evandale, LLC | SVIP, Class B | Exited 2014 |
| SMALLER PODIUM | Mathilda 1 | 538 Mathilda LLC | SVIP, Class B | Exited 2015 |
| | Madison Place (aka Monroe) | 1460 Monroe LLC | SVIP, Class C | Exited March 7, 2018 |
| | Crown Court (aka aka Park Place) | Crown Court Fremont, LLC | Silicon Sage Investments, LLC | Exited August 24, 2016 |
| | Alexis (aka El Camino Real aka Creekside Terrace) | 2585 El Camino Real, LLC | Silicon Sage Investments, LLC | Exited December 27, 2016 |
| | Saratoga (aka Newhall aka Rosa) | 555 Saratoga, LLC | Silicon Sage Investments, LLC | Exited May 5, 2017 |
| | Franklin (aka Downtown Gateway) | 1313 Franklin, LLC | Silicon Sage Investments, LLC | Exited July 3, 2019 |
| LARGER PODIUM | Almaden | 1821 Almaden, LLC | Silicon Sage Investments 2, LLC | Pending |
| | Balbach | 180 Balbach, LLC | Silicon Sage Investments 3, LLC | Pending |
| | Osgood 1 | Osgood, LLC | Silicon Sage Investments 4, LLC | Pending |
| | Mathilda 2 | 528 Mathilda, LLC | Silicon Sage Fund 1, Series 1 | Pending |
| | Peralta | Peralta at Fremont, LLC | Silicon Sage Fund 1, Series 2 | Pending |
| | Osgood 2 | Sage at Irvington, LLC | Silicon Sage Fund 1, Series 3 | Pending |
| | Little Portugal | Little Portugal Gateway LLC | Little Portugal OZ Fund LP | Pending |
| | Alum Rock | Alum Rock Development LLC | Alum Rock Holdings, LLC | Pending |
| | Centerville Station | * | Centerville Station, LLC | Unknown |