1  Brian G. Selden (State Bar No. 261828)
   bgselden@jonesday.com
2  JONES DAY
   1755 Embarcadero Road
3  Palo Alto, CA  94303
   Telephone:    +1.650.739.3939
4  Facsimile:     +1.650.739.3900

5  Dennis F. Murphy, Jr. (State Bar No. 301008)
   dennismurphy@jonesday.com
6  JONES DAY
   555 California Street, 26th Floor
7  San Francisco, CA  94104
   Telephone:    +1.415.626.3939
8  Facsimile:     +1.415.875.5700

9  Attorneys for Creditors
   TRIGATE ALMADEN PE INVESTOR, LLC and
10 TRIGATE FREMONT PE INVESTOR, LLC

11                     **UNITED STATES DISTRICT COURT**

12                    **NORTHERN DISTRICT OF CALIFORNIA**

13

14
   SECURITIES AND EXCHANGE                    Case No. 3:20-cv-09247-SI
15 COMMISSION,
                                              **TRIGATE PARTIES' OPPOSITION**
16                Plaintiff,                  **TO MOTION OF RECEIVER FOR**
                                              **ORDER APPROVING**
17        v.                                  **CONSTRUCTION FUNDING**
                                              **AGREEMENT WITH ACRES**
18 SILICONSAGE BUILDERS, LLC aka              **CAPITAL**
   SILICON SAGE BUILDERS and SANJEEV
19 ACHARYA,                                   Date:  December 3, 2021
                                              Time:  10:00 a.m.
20                Defendants.                 Crtrm:  1 – 17th Floor (via Zoom)
                                              Judge:  Hon. Susan Illston
21

22

23

24

25

26

27

28

1

## I.      INTRODUCTION

2       The Receiver's moving papers assert, time and again, that the Receiver makes his

3  proposal in the interest of "all creditors."  Dkt. 212 at, *e.g.*, 1:13, 3:4.  But the Receiver's papers

4  say otherwise.  Instead, the Receiver's papers propose to reward Acres—the lender that

5  collaborated with the Receiver to shut down construction work on 1821 Almaden, LLC

6  ("Almaden") and Osgood, LLC ("Osgood") (together the "SPVs" and the real estate projects

7  owned and being developed by the SPVs, the "Projects") last February—with more than **$7**

8  **million** in interest, on top of a return of $85 million in capital and $18.9 million in interest

9  already accrued.  The Receiver proposes to reward himself with **$1.8 million**.  And the Receiver

10  proposes that every other creditor of the Estate—including some who placed deposits on units—

11  collectively split $400,000, an amount that they possibly would have to share with other creditors

12  of SiliconSage as a whole.

13       The Receiver's proposal should be rejected, and the Receiver's motion denied in its

14  entirety.

15       First, the Receiver's proposal is not the best proposal on the table.  Creditors TriGate

16  Almaden PE Investor, LLC and TriGate Fremont PE Investor, LLC (together "TriGate") have

17  proposed a larger recoupment for the Estate, with fewer conditions.  A comparison of the two

18  proposals is in <u>Appendix A</u> (attached), but the beneficiaries of the Projects are as follows:

19

|  | Receiver/Acres Proposal | TriGate Proposal |
|---|---|---|
| Acres (interest already paid) | **$18.9 million** | $18.9 million |
| Acres (<u>new</u> interest under proposed agreement) | **Total:  $7,037,861**<br>Osgood:  $2,883,186<br>Almaden:  $4,154,675 | To be negotiated |
| Receiver and counsel | **Total**:  $1.8 million<br>Osgood:  $900,000<br>Almaden:  $900,000) | TBD |

| All other investors and lenders combined | $400,000* (total to be split among all other creditors)* | **$500,000*** |

\* Under both proposals, creditors in the Projects *may* obtain a possible additional claim *if* the Receiver concludes that SiliconSage was a unitary enterprise and *if* the Court agrees and *if* the Estate recovers funding, and *then* to be allocated among all SiliconSage creditors in an unknown manner.

Second, setting aside TriGate's unsolicited proposal, the Receiver has not attempted to find any better resolution for "all creditors."  Other than a throwaway footnote, the Receiver does not even attempt to show any effort to find alternate funding or ways to complete the Projects. Indeed, the Receiver failed even to approach *TriGate*, an investor with $20 million at risk in the Projects, an explicit and well-known willingness to invest further to see them to completion, and direct knowledge of the Projects and the efforts needed to do so.  If the Receiver refused to solicit a competing bid from TriGate, how can the Court have confidence that the no-bid agreement with Acres is the best deal possible for the Estate?

Third, the Receiver's proposal relieves Acres—and Acres alone—from any impact of the Receivership Order.  Dkt. 213, Ex. 5 (Proposed Agreement 2.3 ("On the Effective Date, Acres will have relief from the Receivership Order to exercise its state law and contractual remedies.")). The Receiver offers no explanation as to why Acres should receive this preferential treatment, nor is Acres constrained in pursuit of its remedies in any way, other than as to the "Almaden Indebtedness" and the "Osgood Indebtedness."  *Id.*

Fourth, to the extent that Acres's rights outside the Receivership Order are constrained, it is only because the Receiver proposes to deputize himself to work for Acres, not the Estate or the Court.  SiliconSage entered into a number of sales contracts allowing purchasers to deposit money toward condominiums at below-market rates.  Dkt. 212 at 10-11.  Under the Receiver's proposal, Acres agrees to forebear from exercising its state and contractual remedies with respect to the Almaden Indebtedness and Osgood Indebtedness only for so long as the Receiver pursues recharacterization of those sales with the Court.  Dkt. 213, Ex. 5 (Proposed Agreement 2.4).  The moment that the Receiver stops pursuing that relief for Acres, or fails, then Acres has the right to

TRIGATE'S OPP. TO RECEIVER'S
MOTION 3:20-cv-09247-SI

1   foreclose. *Id*. This is a double whammy. Off the top, the Receiver has agreed to deputize

2   himself for the benefit of Acres alone. Dkt. 212 at 13:14 ("these efforts are expected to likely

3   inure solely for Acres' benefit"). And if that fails—if the Court holds, for example, in favor of

4   any of these condominium purchasers—the Receiver already would have pre-granted Acres the

5   ability to forego the Court's holding by foreclosing outside of the Receivership.

6   Fifth, the negotiation of this provision demonstrates the Receiver's limited ability in

7   negotiating for "all creditors." The Receiver's papers as filed stated that there would be a limit

8   below which Acres could not foreclose on the Projects. But the Receiver could not achieve any

9   proposed limit on Acres's rights, and the Receiver had to file an errata admitting that he was

10   unable to achieve even such a limited concession. Dkt. 215.

11   Sixth, the Receiver is picking and choosing winners—and is costing the Estate millions of

12   dollars in doing so. There is no small irony in the Receiver's position as to the "disguised loans."

13   It was TriGate that discovered the loans in the first instance, and TriGate of course agrees that the

14   treatment of those sales/loans are central to the economics of the Projects. TriGate's fully-agreed

15   three-party deal with the Receiver and Acres and TriGate contemplated that TriGate's interests

16   would be accelerated to address this very issue. But the Receiver reneged on the three-party

17   agreement because, he says, he could not prioritize TriGate when he had to consider the interests

18   of "all creditors." Dkt. 212 at 27 (Stapleton Decl. ¶ 6). Had the Receiver signed the three-party

19   agreement in February or March, both Projects would have been completed already this year, and

20   the Estate would have been many millions of dollars better off. Instead, the Receiver now is

21   asking the Court to approve for Acres's benefit terms that he rejected eight months ago for

22   TriGate, and has run up millions of dollars in costs to get from one position to the other.

23   Seventh, the Receiver has not provided TriGate or the Court sufficient basis to consider

24   many of the ancillary requests in his motion. TriGate has long since requested various documents

25   from the Receiver, including progress reports (which were promised), loan and sale documents

26   (which were promised), and budgeting information (some, but not nearly all, of which was

27   presented only with the Receiver's motion). The Receiver has not provided a report on the

28   Projects for any period since June 30—more than five months ago—and explains few if any of

TRIGATE'S OPP. TO RECEIVER'S
MOTION 3:20-cv-09247-SI

1    the requests for relief in its motion.  TriGate expects not to oppose the Receiver's requested relief

2    (2) (retention of FCM Law) or (3) (approval of the form used for residential purchase

3    agreements).

4            Eighth, the equities strongly favor the TriGate proposal over the Receiver's proposal to

5    shower even further benefits on Acres.  Acres already has tried to foreclose on the Projects once,

6    in 2020 before the SEC complaint, only for the Projects—and every creditor—to be salvaged by

7    TriGate's $20 million rescue capital infusion.  Acres purported to be reviewing SiliconSage's

8    invoices and accounting, but instead allowed it to fester for years.  Acres injected itself in

9    February and March to forestall the earlier, three-party deal that would have gotten the Projects

10   completed and sold already.  And Acres—alone among creditors—already has pulled $18.9

11   million from the Projects, and is positioned to receive its entire $85 million loan capital back as

12   well.  TriGate, in contrast, already has saved the Projects from foreclosure once, and was

13   instrumental in discovering fraud, in replacing SiliconSage Builders, and in finding the

14   construction contractor and various subcontractors that currently are working on site.  Even the

15   $400,000 provision of the Receiver's Acres proposal likely is attributable to TriGate; neither in

16   public filings nor in private communications did the Receiver mention such a structure until

17   TriGate moved to replace the Receiver on this case.

18           Finally, the Receiver apparently believes that he scores points by slurring TriGate as

19   "desperate to regain control of the Projects."  Dkt. 212 at 1:13.  That is an odd framing, but

20   TriGate will accept it.  TriGate is a fiduciary for the investment funds of California teachers and

21   other state and municipal employees.  It is TriGate's responsibility to take all possible steps to

22   protect and preserve those funds.  So while TriGate's involvement here has been unusual, so too

23   has it been essential.  SiliconSage put TriGate's entire $20 million at risk, and the actions of the

24   Receiver and his collaboration with Acres have wasted much of what was left.  Every day since

25   February 9, the Projects have lost value.  TriGate seeks control to stop that decline, and has put

26   $500,000 on the table because it believes in its ability to do so.

27

28

TRIGATE'S OPP. TO RECEIVER'S
MOTION 3:20-cv-09247-SI

## II.     ARGUMENT

### A.     The Acres Agreement Is Not in the Best Interests of the Estate.

To date, only one party has benefitted from the Projects:  Acres, which has received almost $19 million in interest from the Projects.  *See* Dkt. 197-2 at ¶ 8.  The Receiver proposes to keep Acres as the only beneficiary, pushing another $7 million in interest to Acres and $1.8 million to himself, with only a small set-aside for the Estate.  That proposal, and that management, cannot be in the best interests of the Estate.

Especially inapt is the Receiver's invocation of his own "business judgment" as sufficient authority for his elections, as the record shows that a combination of inattention and poor judgement has cost the Projects dearly.  In some situations, it is not even clear whether the Receiver exercised judgment at all.  For example, the Receiver uses a two-sentence footnote in a brief (Dkt. 212 at p. 8, n.3) to assert that he placed "calls" to financiers other than Acres.  But that assertion is not supported by proposals, or by alternative structure ideas, or even by the names of other potential funding sources.  Nor is there any reason to believe that these calls in fact were intended to identify other funding sources; the Receiver has known since his appointment that TriGate was both invested in the Projects already and determined to see them through, and yet not once in eight months has the Receiver invited TriGate to come up with a better deal for the Estate than Acres.

The economics of the Projects, meanwhile, have cratered under the Receiver/Acres arrangement.  Here is what the economics were in February before the Receiver's actions evaporated any potential return on investment.  During the Receiver's first two weeks of control in February 2021, Suffolk Construction—the new third party general contractor engaged by TriGate—sent the current drafts of the construction agreements for both Projects to the Receiver for his review.  At the time, the Osgood Project was projected to be completed in May 2021 and the Almaden Project by August 2021.  *See* Dkt. 183-1 at ¶ 27.  The budgets for both Projects still showed profitability assuming construction began again quickly.  Since that time, the Receiver has cut out TriGate completely and run up a deficit on both Projects on his own watch.  In the Receiver's own words, "the focus of [his] efforts in the period from April through June" 2021—

*i.e.*, the entirety of the Second Quarter, and the last period for which the Receiver has submitted any report—was not completing construction, but "complet[ing] forensic reviews" for the purpose of budgeting.  Dkt. 203 at p. 24, Decl. of David Stapleton ¶ 8.  During this hands-off review period, the Receiver has:

- continued to incur an exceptional amount of running interest (the Receiver estimates paying more than $7 million in interest to Acres over the now-extended Receivership period (Dkt. 212 at 14:23-24 and 15:1-2));

- gone out-of-pocket for "soft costs" like insurance directly related to the extended window before completion (*see, e.g.*, Dkt. 203 at p. 24, Stapleton Decl. ¶ 8 (acknowledging $1.3 million in second-quarter "soft" costs, despite no construction)); and

- absorbed the daily-increasing costs of construction materials and worker scarcity (which the Receiver has chosen not to describe, much less quantify, for the Court); all while

- allowing project assets to waste in the elements or because of inaction.  *See, e.g.*, Dkt. 203 at pp. 30-31, Decl. of David Kieffer ¶ 5(f) (discussing just one parking system left unused during delay:  "As time passed, the equipment has been damaged and will need to be fixed, increasing the costs by $400,000.").

As explained previously (*see* Dkt. 209), the Receiver's three-month pause from April to June alone cost the Projects multiples—likely 10x or more—of the $400,000 "guarantee" that the Receiver now reports Acres will provide to the Estate.  The Receiver acknowledges that the "primary purpose of equity receiverships is to promote orderly and efficient administration of the estate by the district court *for the benefit of creditors*."  *SEC v. Hardy*, 803 F.2d 1034, 1038 (9th Cir. 1986) (emphasis added).  But what benefit is there from the Acres Agreement?  A promise of $400,000 to the Estate, which TriGate has already topped at $500,000.  The Receiver is trying to keep the status quo with him in charge of the Projects where a change in control will result in more money recovered for the Estate.

Additionally, under the Receiver's economic analysis and proposed waterfall, certain

"secured junior noteholders" will recover before TriGate. *See* Dkt. 212 at p. 15. According to the Receiver, almost all of the liens currently on the two Projects were recorded *after* TriGate invested in August 2020. Moreover, one of the lienholders for both Projects is *SiliconSage Construction, Inc.*, which placed liens on the Projects in January and February 2021. *See* Dkt. 212 at p. 11; Dkt. 211 at p. 7-9.[1] Allowing the lienholders—particularly SiliconSage Construction, Inc.—to be paid in sequential order before TriGate and other investors (assuming in the unlikely event that there is any money to recover) when most of the liens were recorded after TriGate's investment does not make sense.

Further, TriGate identifies at least two issues with structuring the Agreement so that the fees and costs of the Receiver incurred in connection with the management of the Projects are paid as part of the protective advances from Acres. First, having the Receiver's fees and costs paid for by the protective advances (*see* Dkt. 212 at p. 12-13) does not benefit the Estate in the end. As the dollar amount in protective advances from Acres increases, Acres's right of recovery under the budget and waterfall provided by the Receiver also continues to increase at an interest rate of 8%. *See* Dkt. 212 at p. 14-15. Once again, both the Receiver and Acres have no incentive to complete the Projects efficiently so long as they stay within the net sale proceeds for each Project to ensure a full recovery for each of them. These protective advances—which were first being used to fund soft costs and are now also being used to pay the Receiver in full—continue to decrease the likelihood that anyone else sees any sort of recovery from their investment for these Projects. The Receiver goes to great lengths to indicate that he has *not* concluded that the Projects are not part of a "unitary enterprise" (*see, e.g.*, Dkt. 212 at p. 12), yet his actions here and in his prior fees applications (*see* Dkt. 174, 175) demonstrate otherwise. The Receiver, again, fails to discuss why pushing forward now after months of delay is the right course for either Project. Would pushing one or both Projects into bankruptcy save the Estate money? It is unclear from the Receiver's motion because it does not appear that the Receiver or Acres have ever seriously considered that option and have instead focused on how best they can get paid.

---

[1] SiliconSage Construction, Inc. is only listed as a lienholder for Osgood in Dkt. 212, but it is listed as a lienholder for both Projects in other documents (*see, e.g.*, Dkt. 211).

TRIGATE'S OPP. TO RECEIVER'S
MOTION 3:20-cv-09247-SI

1        Second, in the October 6, 2021 order on the Receiver's fees for the period from April 1,

2 2021 to June 30, 2021, the Court suspended approval of fees related to the Projects until certain

3 issues were resolved. *See* Dkt. 200.  The Court also approved the interim payment of only 75%

4 of the balance of the fees for all other projects to be paid as funds become available.  While the

5 Court can certainly enter a new fees order, which the Receiver seeks with his motion, the

6 Receiver now appears to be asking the Court to unilaterally approve 100% of his fees in

7 connection with the two Projects without further opportunity for scrutiny from other interested

8 parties through routine fee applications.  Any fees incurred by the Receiver should have to be

9 submitted to the Court for approval with an explanation of what the Receiver did to incur those

10 fees.  Additionally, any fees submission should take into account how the Receiver already has

11 drained the value of the two Projects through a protracted negotiation with Acres, thereby stalling

12 construction on the Projects.

13        After months of negotiation while the Projects largely sat idle without any progress on

14 construction, the Receiver now proposes the Acres Agreement as the best option moving forward

15 for the Projects where only the Receiver and Acres benefit to the detriment of the rest of the

16 Estate.  Despite what the Receiver claims, this cannot be in the Estate's best interests.

17
      **B.**     **The Receiver and Acres Have Yet to Even Finalize the Agreement, Including**
18                  **as to Material Terms.**

19        The Receiver first disclosed "finalizing" an agreement with Acres back in April (*see* Dkt.

20 117 at p. 7) and is somehow still negotiating key details of that agreement while also seeking the

21 Court's approval of an unfinished document (*see* Dkt. 212 at p. 12, n.7).  Leaving aside the fact

22 that TriGate and other parties are being asked to respond to a motion seeking approval of a yet-to-

23 be finalized document, the Receiver also filed an errata indicating that one of the material terms

24 that the Receiver thought was in the agreement, in fact is not.  *See* Dkt. 215.  Acres and the

25 Receiver have not agreed to any limitation—other than an affirmative order from this Court—on

26 Acres's ability to foreclose on both properties, meaning that Acres's right to foreclose potentially

27 could vest as soon as the agreement is signed.

28        As currently drafted, Section 2.4 of the Agreement (Dkt. 213, Ex. 5 at p. 385-86) grants

Acres the right to foreclose unless the Court holds that every one of the identified sales is recharacterized as a loan.  Presumably (though this is not explicit) Acres would pursue the same relief if the Court is unable to make such a determination, or there is delay, or if seeking a determination is deemed futile.  Put another way—while the Projects nominally would remain in the Receivership for "all creditors," in reality Acres would have both full control and full incentive to foreclose on them, wiping out any interest that the Court or the Receivership otherwise would be seeking to protect.  Even more questionable is that the Receiver has not yet pursued the "judicial determination" that he now reports is essential.  The Receiver conducted his review of the relevant books and records eight months ago, in March.  Dkt. 203 at p. 22, Stapleton Decl. ¶ 5.

Also undecided, apparently, is the budget for the Projects and, with it, Acres's obligation to fund.  The Receiver has represented to the Court that the extraordinary pause in construction— from February through June 30 (the last date reported in any quarterly report), and perhaps longer—was necessary so that the Receiver and Acres could collaborate on "forensic budgeting." During that time, prices rose, water seeped, and contracts and sales leads grew stale.  But even with that pause, the Receiver and Acres still are unsettled as to the total cost to complete construction for either Project.  *See* Dkt. 212 at p. 10.  TriGate certainly recognizes that budgeting can be hard, and also that it can change.  What TriGate cannot accept, however—and neither should the Court—is using "budgeting" as a justification for significant and ongoing harm to the Estate.

## C.    TriGate's Proposal Is Superior.

TriGate's proposal is superior or equal to the Receiver's deal with Acres in every way. TriGate guarantees more money for the Estate, $500,000 to $400,000.  TriGate's proposal, like the Receiver's, would allow creditors to make claims against the SiliconSage Estate.  Any claim against the Receivership Estate is likely illusory, as even if the Receiver chose to pursue a unitary enterprise, and if the Court grants such a determination, the Estate has dozens of creditors but only approximately $14 million in funds recovered across the entirety of SiliconSage Builders. Under TriGate's proposal, while the Projects would be removed from the Receivership Estate on

1   a going-forward basis, and while TriGate would have control to complete the Projects, there

2   would be no other change in the shares held or economic interests of the other investors.

3         The Receiver's most significant criticism of TriGate's proposal is that TriGate does not

4   yet have a full plan for the Projects in place.  But that is to be expected.  The Receiver has had

5   full control of the Projects for more than nine months, and has not submitted a report—formally,

6   to the Court, or informally, to TriGate—covering any period since June 30.  TriGate needs access

7   to both the site and the records to assess.  What TriGate has, however is a substantially better

8   track record in moving the Projects forward.  TriGate previously was in control of the Projects for

9   44 days, and during that time replaced SiliconSage as the contractor, installed a construction

10  manager, found a general and other contractors, identified the very mold and railing issues that

11  have befuddled the Receiver, and put the Projects on a path toward completion.  The Receiver has

12  done the opposite, allowing the Projects to atrophy for months in the name of "budgeting," and

13  then allowing its initial delays to become interminable and the costs massive.

14        The Estate would benefit directly and immediately, and TriGate—already the innocent

15  creditor burdened with the largest losses, in addition to its loss of operating rights—would have at

16  least some of its rights restored. The enforcement action would be one step closer to being

17  resolved.

18  **III.    CONCLUSION**

19        For these reasons, with the exception of the appointment of FCM Law and the approval of

20  forms, TriGate requests that the Court deny the Receiver's motion (Dkt. 211) in its entirety and

21  reject the proposed Acres Agreement.  Instead, the Court should enter an Order amending the

22  Receivership Order (Dkt. 63) to remove Osgood, LLC and 1821 Almaden, LLC from the

23  Receivership Entities, and restoring TriGate to its position as of February 9, 2021.

24

25

26

27

28

TRIGATE'S OPP. TO RECEIVER'S
MOTION 3:20-cv-09247-SI

1     Dated: November 12, 2021                    Respectfully submitted,

2                                                 JONES DAY

3

4                                                 By: */s/ Brian G. Selden*
                                                     Brian G. Selden
5
                                                  Counsel for Creditors
6                                                 TRIGATE ALMADEN PE INVESTOR, LLC
                                                  and TRIGATE FREMONT PE INVESTOR,
7                                                 LLC

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

TRIGATE'S OPP. TO RECEIVER'S
MOTION 3:20-cv-09247-SI

## APPENDIX A

| Recovery for the Estate from the Projects | | |
|---|---|---|
| | Receiver/Acres Proposal | TriGate Proposal |
| Amount Guaranteed to the Estate | $400,000 | $500,000 |
| Additional Amount to be Recovered from the Projects | $0 | To be determined |

| Beneficiaries | | |
|---|---|---|
| | Receiver/Acres Proposal | TriGate Proposal |
| Acres (interest already paid) | **$18.9 million** | $18.9 million |
| Acres (interest promised) | **Total:  $7,037,861** Osgood:  $2,883,186 Almaden:  $4,154,675 | To be negotiated |
| Management and Legal Costs | **Total**:  **$1.8 million** Osgood:  $900,000 Almaden:  $900,000 (Receiver and counsel) | TBD |
| TriGate | **$0*** | TBD |
| Junior noteholder (Gupta family) | **$0*** (Receiver requests that liens be set aside and Gupta family treated as general creditor [Dkt. 212 at 21:3-6]) | TBD |
| Sangeeth Peruri | **$0*** (Receiver commits to request that deposits be recharacterized as "loans" [Dkt. 212 at 16:3-7], with Acres | TBD |

| | | |
|---|---|---|
| | entitled to foreclose if not so characterized.)<br><br>[subject to separate pending motion] | |
| Other "disguised loan" depositors | **$0\***<br><br>(Receiver commits to request that deposits be recharacterized as "loans" [Dkt. 212 at 16:3-7], with Acres entitled to foreclose if not so characterized.) | TBD |
| Other creditors | **$0\*** | TBD |

\* The Receiver states that some creditors may recover some money ***if*** the Receiver chooses to pursue a finding that SiliconSage is a unitary enterprise and ***if*** the Court grants such a motion and ***if*** Osgood and Almaden are held to be part of such a unitary enterprise and ***if*** there is recovery for the Estate.  The Receiver to date has not committed to such a motion, nor has the Receiver committed to any recovery.  The Receiver's dispositions of existing SiliconSage projects has netted the Estate approximately $14 million, but claims have not yet been made and the Receiver reports that he has "no idea" as to the number of possible claimants.