**SMILEY WANG-EKVALL, LLP**
Kyra E. Andrassy, State Bar No. 207959
kandrassy@swelawfirm.com
Michael L. Simon, State Bar No. 300822
msimon@swelawfirm.com
Timothy W. Evanston, State Bar No. 319342
tevanston@swelawfirm.com
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Telephone:  714-445-1000
Facsimile:   714-445-1002

Counsel for David Stapleton, Receiver

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                                  Plaintiff,<br><br>          v.<br><br>SILICONSAGE BUILDERS, LLC aka SILICON SAGE BUILDERS and SANJEEV ACHARYA,<br><br>                                  Defendants. | Case No. 3:20-cv-09247-SI<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION OF RECEIVER, DAVID STAPLETON, FOR ORDER POOLING ASSETS AND LIABILITIES BECAUSE THE RECEIVERSHIP ENTITIES OPERATED AS A UNITARY ENTERPRISE**<br><br>**[Notice of Motion and Motion and Declarations of Quintin Brown and David Stapleton Filed Concurrently]**<br><br>Date:   February 17, 2023<br>Time:  3:00 p.m.<br>Crtrm.: 1 – 17th Floor (hearing via Zoom)<br>Judge: Susan Illston |

# TABLE OF CONTENTS

Page

I. INTRODUCTION ........................................................................................................... 1

II. BACKGROUND FACTS ............................................................................................... 1

    A. The Securities and Exchange Commission Commences Its Civil Enforcement Action, Alleging that SiliconSage Builders and Sanjeev Acharya Were Perpetuating an Investment Fraud ....................................... 1

    B. The Court Appoints the Receiver, Who Confirms the Extensive Commingling of Funds by the Receivership Entities ................................... 3

    C. Investor Claims and Rollovers to Different Entities ..................................... 7

III. LEGAL ARGUMENT .................................................................................................... 8

IV. CONCLUSION ............................................................................................................. 13

SMILEY WANG-EKVALL, LLP
3200 Park Center Drive, Suite 250
Costa Mesa, California 92626
Tel 714 445-1000 • Fax 714 445-1002

2929882.1

MEMORANDUM OF
POINTS AND AUTHORITIES

## I. INTRODUCTION

During the course of the Receiver's administration of the receivership estate and his review of various records, it has become apparent that funds flowed through the entities under receivership (together, the "Receivership Entities") as they were needed, and without regard to the separateness of the entities or their distinct business purposes. Although the Receiver's forensic accountants were unable to conduct a full analysis of the sources and uses of cash by the Receivership Entities because of the significant volume of transactions and the convoluted nature and pattern of transactions within the bank accounts that is described below, they conducted a full analysis of randomly selected transactions and verified that funds flowed freely between the entities and that loans and investments intended for one entity were frequently used to pay the obligations of other entities. In addition, investors who put money into one entity often rolled their investments over into different entities. Given the totality of the circumstances, the Receiver believes that the most equitable outcome for all creditors and investors will be to deem the Receivership Entities a unitary enterprise and to therefore permit their assets and liabilities to be pooled.

## II. BACKGROUND FACTS

### A. The Securities and Exchange Commission Commences Its Civil Enforcement Action, Alleging that SiliconSage Builders and Sanjeev Acharya Were Perpetuating an Investment Fraud

In late December 2020, the Securities and Exchange Commission (the "SEC") commenced this litigation against defendants SiliconSage Builders, LLC ("SSB"), and Sanjeev Acharya (together, the "Defendants") alleging violations of federal securities laws. The SEC concurrently filed a motion for a preliminary injunction (the "SEC Motion") and for the appointment of a Receiver over not just SSB, but all of its affiliates and

subsidiaries.[1] The SEC Motion, which was supported by substantial evidence, described the manner in which Acharya conducted business through his various corporate entities.

SSB described itself on its website as a "construction and building company focused on multi-family and mixed-use communities in Silicon Valley." Acharya used a number of different entities, referred to by the Receiver as the "Receivership Entities," to conduct his real estate business. SSB led the process of land acquisition, obtaining entitlements, and designing projects. SiliconSage Construction, Inc. ("SSC"), served as the general contractor on projects, SiliconSage Homes, Inc., marketed the properties, and SiliconSage, Inc. provided technical support. Other entities, including SiliconSage Investments 3, LLC, SiliconSage Investments 4, LLC, and Alum Rock Holdings, LLC, were formed to provide financing to the Receivership Entities. Acharya directly or indirectly owned or had an ownership interest in each of the Receivership Entities, and he controlled the business and financial operations of each of them.

The motion presented testimony from an accountant who worked for Acharya over an eight-month period as an accounting consultant. This consultant testified that expenses were often misclassified and funds were frequently commingled, and that Acharya exercised a significant amount of control over the finances. *See* Declaration of Uday Bellary at ¶¶ 19-26, filed as Document No. 11.

The motion also presented evidence of how investor funds were funneled into the Receivership Entities, with some investors contributing funds in exchange for equity interests, others loaning money via promissory notes, and others investing through SiliconSage Bridge Fund, LLC (the "Bridge Fund"). Equity investors contributed money towards specific projects, usually through a subscription agreement for a particular entity which was to then loan money to the entity that owned the project to acquire land and develop it. These entities included SiliconSage Investments, LLC, SiliconSage

---

[1] The SEC Motion was filed as Document No. 10 and supported by multiple declarations filed as Document Nos. 17 through 30. The allegations in the Motion and supported by the declarations are incorporated into this Memorandum by this reference.

Investments 2, Bay Area Investment Properties 2, LLC, Santa Clara Real Estate Loan 2, LLC, and Alum Rock Holdings, LLC, among others. For instance, SiliconSage Investments 3, LLC, was formed to own two subsidiaries, Bay Area Investment Properties 3, LLC, and Santa Clara Real Estate Loans 3, LLC, which were intended to "participate in the acquisition and development [of] land as well as the final construction of residential and mixed use projects. . . . The Members acknowledge that BAIP 3 and SCREL 3 may conduct any other lawful business of any kind, including the borrowing from and lending of funds to other SiliconSage Affiliated Entities on short term, commercially reasonable terms." First Amended Operating Agreement of SiliconSage Investments 3, LLC, attached to the concurrently-filed Declaration of David Stapleton ("Stapleton Declaration") as Exhibit "1." The operating agreements for BAIP 3 and SCREL 3 are attached to the Stapleton Declaration as Exhibits "2" and "3," respectively. Other examples of operating agreements are attached to the Stapleton Declaration.

Other investors purchased membership interests in the Bridge Fund, which was formed to provide financing to all of SSB's projects. The operating agreements for the Bridge Fund provided that its purpose was "to lend funds to SiliconSage Affiliated Entities [sic] for the purpose of their development of residential and/or mixed use projects on real properties owned by those companies." A copy of the relevant portion of this agreement is attached to the Stapleton Declaration as Exhibit "4." Still other investors loaned funds directly to various Receivership Entities, including 1821 Almaden, LLC, and Osgood, LLC.

B.  **The Court Appoints the Receiver, Who Confirms the Extensive Commingling of Funds by the Receivership Entities**

On February 10, 2021, and based on the extensive evidence presented by the SEC, the Court issued a preliminary injunction and entered the Receivership Order, which appointed the Receiver over SSB and its subsidiaries and affiliates, including fifty-five different entities that were specifically identified. Upon his appointment, the Receiver took control of all of the books and records, including all of the electronic accounting

records and access to online banking records for 77 different bank accounts at JP Morgan Chase.

In regulatory receiverships and investment fraud cases, one of the goals of any receiver is to be able to report to the court, the agency that sought the appointment, and investors what happened with the money that came into the entity under receivership.  To do that, forensic accountants will typically review banking records in order to identify inflows of cash, where the cash came from, and where it went.  In this case, however, the sheer amount of transactions and the way funds flowed quickly through multiple entities rendered that a nearly impossible task.  Together, the Receivership Entities had 77 different bank accounts, the time period in question spanned eight years and included more than 130,000 different banking transactions, with money typically flowing through multiple accounts within a matter of minutes before being spent.

Accordingly, in order to understand how the Receivership Entities conducted their business and used funds, the Receiver's forensic accountant selected seven different entities and examined what happened with funds that were loaned or invested by a lender or an investor.  The Receiver selected the seven entities because they owned real properties that the Receiver has either administered or abandoned during the course of his appointment.  Consistent with the evidence presented by the SEC, the Receiver has determined that the Receivership Entities extensively commingled funds.  The transactions that the Receiver's forensic accountant analyzed consistently demonstrated that money put into a specific entity would be transferred through multiple accounts, usually within a matter of minutes, before ending up in the account of an entity that needed to make payments that day.  The transfers appear to have been done without regard to the purpose that the creditor or investor intended the money to be used for and were instead used to satisfy each day's cash flow needs.

Examples of the commingling include the following:

(1) The joint venture partner in Osgood, LLC, put $200,000 into Osgood, LLC's bank account.  On the same day, Osgood transferred $50,000 to SSB, which then quickly

transferred $47,812.00 to B St. Hayward, LLC (an entity that owned a separate real estate project), which purchased a cashier's check for the City of Hayward for an obligation it owed.  *See* Declaration of Quintin Brown and Exhibit "2" thereto.

(2)   On March 11, 2015, an investor put in $800,000 to SiliconSage Investments 4 ("SSI4"), which was intended to be an investment vehicle for Osgood, LLC.  At the time, SSI4 had $7.00 in its account.  A few days later, SSI4 transferred $800,000 to Osgood's account, increasing its bank balance to $803,602.64.  A minute later, Osgood transferred $775,000 to the Bridge Fund, bringing the Bridge Fund's balance to $784,129.14.  The Bridge Fund then made a number of transfers, including a $300,000 transfer to Crown Court Fremont, LLC (again, an entity that owned a separate real estate project), bringing that entity's balance to $303,769.51.  Ten minutes later, Crown Court Fremont transferred $260,820.00 to SSC, bringing SSC's account balance to $297,494.82.  SSC then made four different payments to suppliers for Crown Court Fremont, Saratoga, LLC, and one of the Mathilda projects.  *See* Declaration of Quintin Brown and Exhibit "7" thereto.

(3)   On April 24, 2017, an investor in Sage at Irvington, LLC, invested $300,000 through SiliconSage Fund 1, a Delaware limited liability company (Series) – Series 1 ("SSF1 Series 1"), bringing that entity's bank account balance up to $303,593.84.  The next day, SSFI Series 1 transferred the funds out, sending $180,000 of it to SiliconSage Fund 1, a Delaware limited liability company (Series) – Series 3 ("SSF1 Series 3"), increasing its bank account balance to $180,846.36.  Minutes later, SSF1 Series 3 transferred $180,000 to SSB, which also received a $120,000 transfer from another account so that its balance increased to $379,036.86.  Minutes later, SSB transferred $300,000 to the Bridge Fund, increasing the Bridge Fund's balance to $337,630.21.  The same day and after receiving another transfer of $100,000, the Bridge Fund made a payment of $400,000 to an investor.  *See* Brown Declaration and Exhibit "13" thereto.

(4)   On July 11, 2019, Grand Pacific Financing Corp. loaned 1313 Franklin, LLC, $7,101,068.50.  A substantial portion of the proceeds were transferred to various

MEMORANDUM OF POINTS AND AUTHORITIES

accounts, including $1,330,000 transferred to Santa Clara Real Estate Lending, LLC, on July 12, 2019, which then immediately transferred these funds to SiliconSage Investment 1, bringing its account balance to $1,330,059.83.  Within minutes, SiliconSage Investment 1 transferred $1,326,169.64 via two different transfers to a bank account held by Silicon Valley Investment Partnership.  That entity, in turn, immediately transferred $1,325,000 to Alum Rock Holdings, LLC which then transferred them to SSB.  Still on July 12, 2019, SSB transferred the $1,325,000 to the Bridge Fund, which then transferred them on the same day to a number of accounts, including $890,000 in two separate transfers to SSC.  On July 12, 2019, SSC sent two wires in the amounts of $100,000 to and $786,307.18 to First American Title to pay some mechanic's liens on the Balbach project, an apartment complex owned by an entity other than 1313 Franklin, LLC.  *See* Brown Declaration and Exhibit "19" thereto.

(5) On April 25, 2017, an investor put in $250,000 to SiliconSage Fund 1, a Delaware limited liability company (Series) ("SSF1").  SSF1 transferred the funds to two different accounts, including sending $150,000 to SSF1 Series 3, which then quickly transferred the funds to SSB.  SSB combined the funds with a separate $100,000 transfer and transferred $250,000 to the Bridge Fund.  The Bridge Fund then immediately transferred the funds to SSC, which used them to make payroll.  *See* Brown Declaration and Exhibit "22."

(6) On April 2, 2019, an investor put in $500,000 to Alum Rock Holdings.  Three days later, Alum Rock Holdings transferred the funds to SSB, which then quickly transferred $403,500 of the funds to the Bridge Fund, which immediately transferred them to SSC.  SSC combined these funds with funds from another transfer and wired $457,828.00 to Hard Rock Concrete for progress billing on the project owned by 1821 Almaden, LLC.  *See* Brown Declaration and Exhibit "30."

(7) On July 31, 2018, 138 Balbach, LLC ("Balbach"), received $810,877.73 in loan proceeds from Prime Finance, its construction lender.  Balbach transferred $815,000 to the Bridge Fund's account, which then made a number of transfers to other accounts,

including $420,000 to SSC, bringing its account balance to $463,108. SSC used $306,296 of these funds to make payroll on August 2, 2018. *See* Brown Declaration and Exhibit "35."

(8) On November 20, 2018, Acres Capital, the secured construction lender for Osgood, loaned $1,370,778.55 to Osgood. The next day, Osgood transferred $740,000 to SSC. Within four hours, there were six withdrawals. One for $18,264.34 was a payment to Bell Electric for work performed on the Balbach and Mathilda projects. $20,000.00 was a payment to The Welding Madelid for work performed on the Franklin project owned by 1313 Franklin, LLC. $96,956.65 was for a check to Bay Area High Reach for work performed on the Balbach, Franklin and Monroe projects. $108,611.55 was a check for Sunbelt Rentals for equipment provided to the Franklin, Balbach, and Almaden projects, though approximately $10,000.00 was for Osgood. $88,011.23 was for HD Supply for construction materials for the Almaden, Franklin, Balbach, and Mathilda projects, though approximately $46,000 was for Osgood invoices. $126,676.16 was paid to Graybar Electric for work performed on the Balbach project. $50,000 was paid to Blackwell Engineering for work performed on Balbach. $36,037.80 was paid to Tri-County Insulation for work performed on the Balbach and Franklin projects. A summary of the banking activity is attached to the Brown as Exhibit "3."

These examples alone occurred over a span of five years and involved approximately $10 million. Numerous additional examples are contained in the Brown Declaration.

C. **Investor Claims and Rollovers to Different Entities**

The Receiver distributed claims packages in October 2022, with a December 13, 2022, deadline to submit claims with supporting documentation. The Receiver received more than 600 claims and is in the process of reviewing them to verify that the claims are supported by adequate evidence, to identify claims that need to be further reviewed, and to identify against which entities claims are being asserted. Although the review is still in process, the Receiver has observed that claims were filed against most of the

Receivership Entities, with some investors identifying all of the Receivership Entities as being liable for their claim and others identifying multiple Receivership Entities. Some investor confusion likely results from the fact that investors were permitted to rollover investments in one entity to another. Examples of these were presented in connection with the SEC Motion through declarations of three different investors. *See* Preliminary Injunction Motion at 13:21-24, 15:9:16.

Indeed, the Receiver's efforts to recharacterize certain purchase agreements for the Osgood and Almaden projects was based in part on several investors who responded to a pitch from Acharya to raise funds for the Receivership Entities by enticing existing investors in other funds to put in additional money by offering to permit them to rollover a portion of their investments in other funds if they agreed to put in two times the amount of the rollover in cash as a deposit towards the purchase of a condominium. An example of this is attached to the Stapleton Declaration as Exhibit "15." This all lends support to treating the Receivership Entities as a unitary enterprise.

As of December 31, 2022, the Receiver is holding approximately $13.1 million, attributable almost entirely to the sale of real properties, with the properties owned by Balbach and Sage at Irvington contributing the most. This amount does not take into account accrued and unpaid administrative costs.

III.   **LEGAL ARGUMENT**

"The power of a district court to impose a receivership or grant other forms of ancillary relief does not in the first instance depend on a statutory grant of power from the securities laws. Rather, the authority derives from the inherent power of a court of equity to fashion effective relief." *SEC v. Wencke*, 622 F.2d 1363, 1369 (9th Cir. 1980). The "primary purpose of equity receiverships is to promote orderly and efficient administration of the estate by the district court for the benefit of creditors." *SEC v. Hardy*, 803 F.2d 1034, 1038 (9th Cir. 1986).

District courts have the broad power of a court of equity to determine the appropriate action in the administration and supervision of an equity receivership. *See SEC v. Capital Consultants, LLC*, 397 F.3d 733, 738 (9th Cir. 2005). The Ninth Circuit explained:

> A district court's power to supervise an equity receivership and to determine the appropriate action to be taken in the administration of the receivership is extremely broad. The district court has broad powers and wide discretion to determine the appropriate relief in an equity receivership. The basis for this broad deference to the district court's supervisory role in equity receiverships arises out of the fact that most receiverships involve multiple parties and complex transactions. A district court's decision concerning the supervision of an equitable receivership is reviewed for abuse of discretion.

*Id.* (citations omitted); *see also CFTC v. Topworth Int'l, Ltd.,* 205 F.3d 1107, 1115 (9th Cir. 1999) ("This court affords 'broad deference' to the court's supervisory role, and 'we generally uphold reasonable procedures instituted by the district court that serve th[e] purpose' of orderly and efficient administration of the receivership for the benefit of creditors.").

In connection with the administration of an estate, courts are deferential to the business judgment of bankruptcy trustees, receivers, and similar custodians. *See, e.g.*, *Bennett v. Williams*, 892 F.2d 822, 824 (9th Cir. 1989)("[W]e are deferential to the business management decisions of a trustee."); *Southwestern Media, Inc. v. Rau*, 708 F.2d 419, 425 (9th Cir. 1983)("The decision concerning the form of . . . [estate administration] . . . rested with the business judgment of the trustee.").

In connection with the administration of receivership estates, it is not uncommon when there are multiple entities under receivership for receivers to request that the district court authorize the pooling of assets and liabilities. Such an outcome may occur when the court finds that the entities are alter egos of one another. *See Commodity Futures Trading Com'n v. Topworth Int'l, Ltd.*, 205 F/.3d 1107, 1110-11 (9th Cir. 1999) (holding that shareholder assets were part of the receivership estate to be distributed pro rata to investors where the entity they owned was undercapitalized and funds were freely

transferred between shareholders and the entity).  It is also common where there is extensive commingling of funds, particularly when funds are transferred based primarily, if not entirely, on availability and cash flow needs.  *See, e.g.*, *SEC v. Sunwest Mgmt., Inc.*, 2009 WL 3245879, at *6 (D. Or. 2009)(approving the pooling of assets and their pro rata distribution when the "pervasive nature of the commingling has rendered it virtually impossible to trace the ultimate source and use of the funds.").  In addition to commingling, where one or two parties exercise control over a number of entities or funds and use the entities or funds as part of an overarching scheme to defraud investors, the pooling of assets and liabilities is appropriate.  *See SEC v. Byers*, 637 F.Supp.2d 166, 180-81 (S.D.N.Y. 2009)(and cases cited therein).  Other courts have held that the assets of receivership entities can be pooled for "good cause shown." In evaluating whether this standard is met, these courts have considered whether "(1) a unified scheme to defraud existed among the receivership entities; (2) the investors across the various receivership entities are similarly situated; and (3) funds were commingled among the receivership entities."  *SEC v. Founding Partners Capital Mgmt.*, 2014 WL 2993780, *6 (M.D. Fla. 2014)(and cases cited therein).  The pooling of assets and liabilities will not impact any secured creditors with perfected liens, including vendee liens, to the extent that that they are secured by collateral.

In this case, given the extensive commingling of funds between the Receivership Entities that has rendered it virtually impossible to determine the precise sources and uses of cash, the Receiver believes that pooling all of the assets and liabilities is the only equitable outcome.  As demonstrated in detail in the Brown Declaration, money intended for one entity often ended up with whichever entity had the cash need on that particular day.  The manner in which cash was handled, being transferred through multiple accounts within a matter of minutes and often being consolidated with funds from other transfers before being dissipated, also supports this conclusion.  There simply is no way to determine with any accuracy whatsoever how funds were used.  Although the properties owned by Balbach and Sage at Irvington are the source of the majority of the

proceeds being held by the Receiver, both of those projects received funds from loans and investments intended for other projects and used funds intended for their projects for other purposes.  This supports the pooling of assets and liabilities.

   The Receivership Entities were part of a unitary enterprise to defraud investors.  Acharya founded and controlled each of the Receivership Entities and used them to perpetuate his fraud.  As set forth in the SEC Motion and the accompanying declarations, Acharya sought out and obtained loans from institutional and hard money lenders and supplemented the loans with money put in by investors.  Acharya solicited the investments, signed the subscription and operating agreements, and directed the flow of funds and managed the maintenance of the books and records of the Receivership Entities.  Acharya controlled their finances and is responsible for the extensive commingling of funds.  Given the flow of funds through the entities and the fact that investors of all entities remain unpaid, the only conclusion that can be drawn is that this was a unitary enterprise, which provides additional cause for the pooling of assets and liabilities.

   Investors appear to be similarly situated, regardless of whether they were equity investors in feeder funds or noteholders of the entities that owned the real property.  Regardless of how they invested, they were promised particular returns from profits from projects.  When those profits failed to materialize, any payments that they received came either from newer investors or from proceeds of loans from unwitting lenders or joint venture partners.  Investor funds were not used in the manner promised and based on the Receiver's analysis of random transactions, were usually used for purposes other than that intended by the investor.  Because the investors in the different entities suffered the same fate, this supports the pooling of assets and liabilities.

   One potential exception to this is a group of investors in the Balbach project (the "Balbach Investor Group") who assert that in 2020, shortly before the filing of this action, they became concerned about the viability of the project and agreed to loan Balbach funds to pay certain expenses.  Though some of the loan proceeds were paid directly to

Balbach, it appears that the Balbach Investor Group may have paid the lender or suppliers directly. They assert that this kept the project from foreclosure and enabled it to become part of the Receivership Estate, stabilizing it for a period to allow the Receiver to take control of it and to sell and realize its net proceeds. Because of this, they take the position that they should be paid first on account of this note, ahead of other investors and creditors. Although the Receiver will consider their position, the Receiver feels compelled to note that of the transactions randomly selected to be analyzed and that are described in the Brown Declaration, there are eleven examples where Balbach benefitted from money that was intended by creditors or investors to be used for other projects. In any event, the Receiver has requested additional information from the Balbach Investor Group but does not believe that their position affects the Receiver's request that the Court order the assets of the Receivership Entities pooled.

Instead, when formulating a distribution plan, the Receiver will take their position into account, and the Receiver is not foreclosing the possibility that he could recommend differing treatment for certain parties if there is an equitable basis for doing so. The Receiver will present the proposed distribution plan to the Court for approval, on notice to investors and creditors. If any party disagrees with the Receiver's recommended method of distribution of the funds on hand, that party can raise their objection in connection with that motion. The fact that an investor group may have put in a relatively small amount of money at the end to save a project does not nullify the reality that the entity that owned the project was part of the network of commingled funds and unitary enterprise that defrauded investors and creditors and that it benefitted from money that was intended for other projects.

For all of the reasons described above, the Receiver believes that the most equitable outcome is for the assets and liabilities of the Receivership Entities to be pooled, without prejudice to the ability of the Balbach Investor Group to raise their argument that they should be given priority in the distribution plan to be proposed by the Receiver.

## IV. CONCLUSION

Because of the extensive commingling of funds, the evidence that the Receivership Entities were operated as a unitary enterprise that perpetuated an investment fraud, and because investors in different projects have suffered similar fates, the Receiver requests that the Court enter an order:

(1) Granting the Motion;

(2) Ordering that the assets and liabilities of the Receivership Entities be pooled, except that this shall not affect valid liens that are secured by property of the Receivership Estate;

(3) Finding that the pooling of liabilities is without prejudice to the ability of the Balbach Investor Group to raise the issue of how the assets are distributed in connection with the Receiver's distribution plan; and

(4) Granting such other and further relief as the Court deems just and proper.

DATED: January 13, 2023                Respectfully submitted,

                                                SMILEY WANG-EKVALL, LLP

By:     /s/ Kyra E. Andrassy
       KYRA E. ANDRASSY
       Attorneys for David Stapleton, Receiver

# PROOF OF SERVICE

**STATE OF CALIFORNIA, DISTRICT COURT, NORTHERN DISTRICT**

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the County of Orange, State of California. My business address is 3200 Park Center Drive, Suite 250, Costa Mesa, CA 92626.

On **1/13/2023**, I served true copies of the following document(s) described **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION OF RECEIVER, DAVID STAPLETON, FOR ORDER POOLING ASSETS AND LIABILITIES BECAUSE THE RECEIVERSHIP ENTITIES OPERATED AS A UNITARY ENTERPRISE** on the interested parties in this action as follows:

## SEE ATTACHED SERVICE LIST

**(X) (BY COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")) –** Pursuant to United States District Court, Northern District of California, the foregoing document will be served by the court via NEF and hyperlinked to the document. On **1/13/2023**, I checked the CM/ECF docket for this case and determined that the aforementioned person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated.

**(X) (BY U.S. MAIL).** I enclosed the document(s) in a sealed envelope or package and placed the envelope for collection and mailing, following our ordinary business practices. I am readily familiar with the practice of Smiley Wang-Ekvall, LLP for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with USPS in a sealed envelope with postage fully prepaid. I am a resident or employed in the county where the mailing occurred. The envelope was placed in the mail at Costa Mesa, California.

**( ) (BY E-MAIL).** By scanning the document(s) and then e-mailing the resultant pdf to the e-mail address indicated above per agreement. Attached to this declaration is a copy of the e-mail transmission.

**( ) (BY FACSIMILE).** I caused the above-referenced documents to be transmitted to the noted addressee(s) at the fax number as stated. Attached to this declaration is a "TX Confirmation Report" confirming the status of transmission. Executed on _____, at Costa Mesa, California.

**( ) STATE** I declare under the penalty of perjury under the laws of the State of California that the above is true and correct.

**(X) FEDERAL** I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on January 13, 2023, at Costa Mesa, California.

     /s/ *Lynnette Garrett*
     Lynnette Garrett

## SERVICE LIST

**BY COURT VIA NOTICE OF ELECTRONIC FILING ("NEF"):**

**Kyra Elizabeth Andrassy**
kandrassy@swelawfirm.com,jchung@swelawfirm.com,lgarrett@swelawfirm.com,gcruz@swelawfirm.com

**Daniel Blau**
blaud@sec.gov,simundacc@SEC.GOV,larofiling@sec.gov

**Tamar M. Braz**
brazt@sec.gov

**Susan Scott Davis**
sdavis@coxcastle.com

**Detail Construction & Waterproofing, Inc.**
sjs@dslaw.net

**David B. Draper**
david.draper@ropers.com,nancy.batchelder@ropers.com,mary.mcpherson@ropers.com

**Timothy W Evanston**
tevanston@swelawfirm.com,jchung@swelawfirm.com,lgarrett@swelawfirm.com,gcruz@swelawfirm.com

**Robert Paul Goe**
rgoe@goeforlaw.com,kmurphy@goeforlaw.com

**Great American Insurance Company**
dtobar@watttieder.com

**Mitchell Bruce Greenberg**
mgreenberg@abbeylaw.com,mmeroney@abbeylaw.com

**John Henry Hemann**
jhemann@cooley.com,mnarvaez@cooley.com,efilingnotice@cooley.com,efiling-notice@ecf.pacerpro.com

**Fred Hjelmeset**
fhtrustee@gmail.com

**Ravi Jagannathan**
btaylor@taylorlawfirmpc.com

**Gregg Steven Kleiner**
gkleiner@rinconlawllp.com,aworthing@rinconlawllp.com

**Edward Arthur Kraus**
ekraus@svlg.com,keb@svlg.com,edn@svlg.com,amt@svlg.com

**Thomas Scott Leo**
sleo@leolawpc.com,kmoore@watttieder.com,dtobar@watttieder.com

**Hal Mark Mersel**
mark.mersel@bclplaw.com,theresa.macaulay@bclplaw.com

**Dennis Francis Murphy**
dennismurphy@jonesday.com,cdelacroix@jonesday.com

**Randy Phillip Orlik**
rorlik@coxcastle.com

**Brian Andrew Paino**
bpaino@mcglinchey.com,irvineECF@mcglinchey.com

**Parkview Financial REIT LP**
paul@parkviewfinancial.com

**Hannah Pollack**
hpollack@cooley.com,efilingnotice@cooley.com,efiling-notice@ecf.pacerpro.com

**Marie Gisele Quashnock**
marie@aqalegal.com,legaladmin@aqalegal.com

**Joshua Louis Scheer**
jscheer@scheerlawgroup.com,jscheer@ecf.courtdrive.com

**Brian G. Selden**
bgselden@jonesday.com,mreyes@jonesday.com

**Steven Jude Sibley**
sjs@dslaw.net

**Benjamin Samuel Taylor**
btaylor@taylorlawfirmpc.com

**Donna Renee Tobar**
dtobar@grsm.com,fvillalobos@grsm.com,ecravey@grsm.com